Filed 11/26/25  In re Contreras CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re<br><br>RUBEN CONTRERAS,<br><br>on Habeas Corpus. | F087853<br><br>(Super. Ct. No. VHC376176)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Nathan D. Ide, Judge.

Kyle Gee, under appointment by the Court of Appeal, for Petitioner.

Rob Bonta, Attorney General, Lance E. Winters and Charles C. Ragland, Chief Assistant Attorneys General, Kimberley A. Donohue, Assistant Attorney General, Amanda D. Cary, Eric L. Christoffersen, Ian Whitney, and Jesica Y. Gonzalez, Deputy Attorneys General, for Respondent.

-ooOoo-

# **INTRODUCTION**

Petitioner Ruben Contreras petitioned the superior court, pursuant to former section 1170.95 (now § 1172.6) of the Penal Code,[1] for resentencing on his conviction for first degree murder (§ 187, subd. (a)). The trial court conducted an evidentiary hearing and denied the petition on the ground petitioner was a major participant in the underlying robbery and acted with reckless indifference to human life.

On appeal, petitioner contends the order denying the petition must be reversed because (1) the trial court failed to consider his age in determining he acted with reckless indifference to human life, and counsel was constitutionally ineffective in failing to raise

---

[1] Undesignated statutory references are to the Penal Code. Former section 1170.95 was renumbered section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.) We refer to the current section 1172.6 in this opinion.

Petitioner filed his resentencing petition on a form petition for writ of habeas corpus, but made clear he was seeking relief pursuant to the procedure outlined in section 1172.6. The court addressed the resentencing petition pursuant to section 1172.6, but continued to caption the petition as one for a writ of habeas corpus and denied it as such. In his notice of appeal, petitioner stated he was appealing from the denial of a section 1172.6 petition.

In a noncapital case, a habeas petitioner cannot appeal from an order denying relief, but rather must file a new petition in a higher court. (§ 1506; *In re Reed* (1983) 33 Cal.3d 914, 918, fn. 2, overruled on another ground in *In re Alva* (2004) 33 Cal.4th 254, 264; *In re Hochberg* (1970) 2 Cal.3d 870, 875, disapproved on another ground in *In re Fields* (1990) 51 Cal.3d 1063, 1070, fn. 3; cf. § 1509.1; *Briggs v. Brown* (2017) 3 Cal.5th 808, 825.) However, an order granting or denying relief pursuant to section 1172.6 is appealable, pursuant to section 1237, subdivision (b), as an order after judgment affecting a party's substantial rights. (See *People v. Heard* (2022) 83 Cal.App.5th 608, 622, fn. 12, superseded by statute on other grounds, as stated in *People v. Lara* (2025) 115 Cal.App.5th 484, 487–488.)

Regardless of how the matter is titled, petitioner's claims are reviewable by us on the merits. The People do not contend otherwise and have elected to brief the matter as a denial of a petition brought under section 1172.6. However, because the instant appeal is from an order styled as an order denying a petition for writ of habeas corpus, we maintain the single title format applicable to habeas corpus proceedings. (Cal. Style Manual (4th ed. 2000) § 6:32.)

this issue; (2) the trial court failed to consider a forensic psychologist's testimony regarding petitioner's cognitive deficits; (3) substantial evidence does not support the court's finding that he was a major participant who acted with reckless indifference to human life; and (4) the trial court improperly relied on evidence adduced at petitioner's preliminary hearing but excluded in petitioner's trial and, to the extent this issue is forfeited, counsel was ineffective in failing to raise it below.

As to the last of these issues, we noted the evidence in question suggested petitioner was present when his coperpetrator stabbed someone earlier on the day of the murder at issue here. The court relied upon this evidence in its findings of fact to conclude petitioner was a major participant in a robbery and acted with reckless indifference to human life. However, upon review of the record, we noted the trial court did not, at the evidentiary hearing, admit or judicially notice the preliminary hearing transcript where the contested evidence was adduced. As such, we invited the parties to brief the following issues: (1) whether any evidence of petitioner's presence at the earlier stabbing was admitted or judicially noticed by the court at the evidentiary hearing; (2) if not, whether the court prejudicially erred in relying on petitioner's presence at the earlier stabbing to find petitioner was a major participant in a robbery and acted with reckless indifference to human life; (3) assuming prejudicial error, whether the court's ultimate finding that petitioner was a major participant in the robbery and acted with reckless indifference to human life is nonetheless supported by substantial evidence, taking into account the guidance provided by the California Supreme Court in *People v. Emanuel* (2025) 17 Cal.5th 867 (*Emanuel*); and (4) the appropriate remedy if the court's ultimate finding is not supported by substantial evidence.

Petitioner now argues the court prejudicially erred by relying on facts not in evidence, the remaining evidence is insufficient to support the court's finding of guilt, and the only appropriate remedy is remand with directions to grant the petition, vacate the conviction, and resentence petitioner. The People argue other evidence in the record

3.

supports a finding petitioner was present at the prior stabbing, reliance on the unadmitted evidence was harmless, substantial evidence supports the court's finding of guilt, and, if this court concludes otherwise, the proper remedy is remand for a new evidentiary hearing.

We conclude the court prejudicially erred in relying on the unadmitted evidence and we therefore reverse. We further conclude remand for a new evidentiary hearing is the appropriate remedy under the specific circumstances of this case. Because our resolution of this issue is dispositive, we address petitioner's remaining contentions only to the limited extent necessary to provide guidance on remand.

## FACTUAL BACKGROUND

On June 20, 2001, Michael Loveland's body was found by his mother in the motel room where he lived.[2] He was severely beaten, and his VCR, telephone, and jewelry were missing from the room.

### I. Prosecution Case

The events leading up to Loveland's killing began on June 17, 2001, when petitioner, Carlos E., Jesse L., and Elena R. went to visit Kelly H. and April C. at the motel where the latter two women lived.[3] The group drank beer in the motel carport and Elena purchased cigarettes from Loveland, who was collecting cans and bottles in the area. During their interaction, Loveland mentioned to the group that he had a little bit of marijuana. Loveland thereafter went into his motel room. Either Kelly or April

---

[2] Loveland was described as having a brain injury that caused him to behave younger than his age of 24.

[3] Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names. No disrespect is intended.

Carlos was 16 years old on the date of the incident and Jesse was 13 or 14 years old. Although the record reflects two dates of birth for petitioner, it appears petitioner was 20 years old on the date of the incident.

described Loveland as a "rat." Petitioner said, "Let's fuck him up," but Elena believed petitioner's statement was said in a joking manner.

At some point, April left the motel. Kelly asked the group to leave the carport because they were getting "rowdy." The group went to the back of the motel. About 20 or 30 minutes after the interaction with Loveland, petitioner and Carlos went to Loveland's room to ask to use the bathroom. Jesse followed a few minutes later. Elena went to the front of the motel, where she talked with Kelly.

A short time later, Elena encountered petitioner, Carlos, and Jesse behind the motel. Petitioner said, "Whatever happens, whoever goes down goes down alone." Someone was smoking cigarettes of the same brand they had bought from Loveland earlier. At that point, Elena and Carlos parted ways with petitioner and Jesse.

On June 19, 2001, petitioner came to Kelly's apartment and told her, "[Y]ou haven't seen or heard of me. I have not been here." He offered to pay her "$50 a week or something" if she promised not to say she had seen him. He was acting nervous and said, "I think there's something wrong with the man in room 14," the room Loveland was living in. When Kelly asked what he meant, he told her she "didn't need to know" and pointed at her "like firing a gun." April was present for this conversation and recalled petitioner stating that "a guy is not going to come out of his room" and they should not say anything. Petitioner also stated he was in the bathroom and came out to find it "already done" but that he cleaned up the "whole mess." He said he would pay Kelly $50 a month to not say anything.

Phillip H. also lived at the motel and saw petitioner there on June 19, 2001. Petitioner asked Phillip if he had seen Loveland around the motel. When Phillip asked why petitioner was asking, petitioner stated, "Oh, no reason." However, later in the conversation, petitioner told Phillip he believed Loveland was dead and stated he was in trouble. He also told Phillip someone else had stabbed Loveland.

5.

On the morning of June 20, 2001, while detectives were in Loveland's motel room, petitioner drove through the motel parking lot and told April, "I think . . . that man in room 14 is dead."

Law enforcement found Loveland's body slumped over the end of the bed in his room. Apparent blood spatter was present throughout Loveland's room. A hammer head was found on the corner of the bed and the hammer handle was located between the dresser and the bed. Shoe tracks were discovered on the stove top under the kitchen window, which led to the back of the motel. Carlos's fingerprints were found on a beer bottle in the room.

An autopsy determined Loveland died from blunt force trauma to his head. He suffered three blows to the back of his head and had four small, superficial puncture wounds in his torso.

Tulare County Sheriff's Detective K. Cotton conducted two interviews with petitioner. The first was conducted on the afternoon Loveland's body was discovered. At that time, petitioner reported that he was at the motel on the date of the murder with two men he identified as "Jose" and "Tony." He later acknowledged this statement was untrue.

In his second statement, given later that evening, petitioner reported he was at the motel on the night of the murder and was drinking with Carlos, Jesse, and Elena. The group purchased cigarettes from Loveland, who mentioned having marijuana in his room. After Loveland left, petitioner and Carlos discussed robbing him of his money and drugs. Specifically, Cotton testified, "It was discussed between Carlos and [petitioner] that they would go in and knock him out and take his stuff." Petitioner initially thought Carlos was joking but stated, "Well, yeah, maybe we should."

Petitioner knocked on Loveland's door and asked to use the bathroom. When he exited the bathroom, he saw Carlos in a chair and Loveland on the bed smoking what he believed to be marijuana out of a "bong." As petitioner took a "hit" from the bong,

6.

Carlos picked up a hammer and struck Loveland on the top of the head, breaking the hammer. Carlos grabbed a bat and struck Loveland another five or six times while petitioner stood by. Jesse came into the room and hit Loveland several times in the torso area where Loveland's stab wounds were later found.

Petitioner felt Loveland's neck but was unable to locate a pulse. Petitioner, Carlos, and Jesse ransacked Loveland's motel room and took the bat, VCR, and marijuana bong. Petitioner stated he took the bat because his fingerprints might be on it and he did not want it traced back to him; he denied his fingerprints would be found on the hammer. The men secured the front door locking chain and climbed out the kitchen window to the back of the motel.

Petitioner acknowledged he offered Kelly $50 to "[k]eep her mouth shut." He stated his actions were motivated by "greed" because he wanted Loveland's marijuana to smoke and sell. Petitioner also admitted speaking to Phillip and telling him of the assault and Loveland's death.

## II.    Defense Case

Petitioner testified in his own defense at trial. He testified that he, Jesse, and Carlos encountered Loveland in the carport, where Loveland told them he had weed and invited them to come to his room to smoke some later. Petitioner testified that, after Loveland left, Carlos asked petitioner if he wanted to go with him to take Loveland's marijuana; petitioner thought Carlos was joking and "kidding[ly]" said, "I guess." Jesse just "kind of laughed."

When petitioner went to Loveland's room to use the bathroom, Carlos followed. Carlos again asked petitioner if he wanted to "take [Loveland's] stuff," but petitioner responded, "Nuh." Carlos grabbed petitioner's shirt "pretty hard," saying, "You're going to help me take his shit or I'm going to fuck you up." Carlos "more or less" pushed petitioner into Loveland's room.

7.

Petitioner used the bathroom and, when he exited, saw Loveland smoking marijuana. Petitioner asked to smoke it and Loveland agreed. While petitioner was smoking, Carlos got up and hit Loveland on the top of the head with a hammer. Carlos then grabbed a baseball bat and hit Loveland in the head approximately five more times. After Carlos finished hitting Loveland, Jesse entered the room and sat down briefly, but then got up and "punched" Loveland "a couple of times" in the area where his stab wounds were later discovered.

Petitioner testified the attack was unexpected and he was "shocked" by it. Petitioner asked, "What are you doing? Why did you do that?" but Carlos did not respond. Petitioner denied he inflicted any of the violence or intended to do so. He checked Loveland's neck for a pulse but found none.

Petitioner and his coparticipants stayed in Loveland's room for approximately another 10 minutes and petitioner was "dazed." Carlos began going through Loveland's belongings and grabbed the VCR and other items. The group left through the back window. Jesse and Carlos told petitioner to hand the bat out the window. As they left, Carlos had the bat and either Jesse or Carlos had the VCR.

Petitioner testified he did not call the police or initially give law enforcement truthful information because he did not want to be labeled a "rat." However, he eventually told officers the truth because he felt he had done nothing wrong.

On cross-examination, petitioner acknowledged that he told investigating officers he went into Loveland's motel room with the intent to rob him, but he claimed to have said this "so they wouldn't think [he] was lying." He acknowledged telling the officers he was going to knock Loveland out if necessary because that is how he thought "a robbery goes down." He acknowledged telling officers he regretted bringing up a robbery that night. He acknowledged he may have told officers he participated in ransacking the room but testified he did not do that. Petitioner did not tell Cotton that

8.

Carlos had threatened him before they went into Loveland's room because he did not want to get into "more trouble."

Dr. M. Daniels, a forensic psychologist, testified that she interviewed petitioner in jail twice due to concerns over his behavior and at the request of his defense team. Daniels administered psychological tests and reviewed records concerning petitioner, including educational assessments. The records indicated petitioner had a history of attention deficit hyperactivity disorder as well as a severe learning disorder "not otherwise specified."

Daniels testified that petitioner had indications for anxiety disorder and possibly posttraumatic stress disorder. He also had a history of methamphetamine abuse and had given "clear indication" of dependent personality disorder, which is characterized by someone being unlikely to take initiative, and likely to follow others and be concerned about how they look to others. She also noted his coping skills were impaired, and he behaved more like someone 12 or 13 years old.

Petitioner told Daniels that he had decided not to go into the motel room with Carlos but had ultimately "went along" with it, which behavior Daniels characterized as typical of someone with a dependent personality disorder. Petitioner reported to Daniels that he "spaced out" during the attack, which behavior is consistent with his anxiety disorder and history of childhood physical abuse. She also testified that petitioner reported being aware that Carlos was rumored to have stabbed someone weeks before and petitioner was afraid of him, which may have triggered his anxiety. Daniels could not discern whether petitioner's involvement in the crime was because he was afraid of Carlos or because he did not want to appear weak to his friends.

**PROCEDURAL HISTORY**

"After a jury trial, [petitioner] was convicted of first degree murder (. . . § 187, subd. (a)), residential robbery (§ 211), and residential burglary (§ 459). The jury found true the special circumstance allegations that the murder was committed during the

9.

commission of a burglary and robbery (§ 190.2, subd. (a)(17)), but found not true the personal arming allegation (§ 12022, subd. (b)(1)). The trial court sentenced [petitioner] to a six-year term on the residential robbery conviction and a consecutive indeterminate term of life without the possibility of parole on the murder conviction. A four-year term on the residential burglary conviction was imposed and stayed, as was a $2,000 restitution fine imposed pursuant to section 1202.45." (*People v. Contreras* (Apr. 21, 2006, F047366) [nonpub. opn.], fn. omitted (*Contreras*).) On appeal, this court ordered the abstract of judgment amended to remove the parole revocation fine but otherwise affirmed. (*Ibid*.)

On February 7, 2019, petitioner filed a petition for writ of habeas corpus, seeking resentencing pursuant to section 1172.6. On February 20, 2019, the court summarily denied the petition without appointing counsel or receiving the briefing specified by statute. On appeal, we held the court prejudicially erred in disposing of the petition without appointing counsel and the record did not reflect petitioner was ineligible for resentencing as a matter of law. We reversed the denial of the petition and remanded with directions to issue an order to show cause. (*In re Contreras* (Dec. 13, 2022, F078975) [nonpub. opn.].)

On remand, the court issued an order to show cause and set the matter for an evidentiary hearing. In advance of the hearing, both parties filed trial briefs. The People's brief relied on the preliminary hearing and trial evidence to argue petitioner was at least a major participant in the underlying murder, robbery, and burglary, who acted with reckless indifference to human life. The People filed a written request for judicial notice of the trial transcript but did not file a request for judicial notice of the preliminary hearing transcript. Petitioner's brief argued he was not the actual killer, did not aid and abet the killer with intent to kill, and was not a major participant who acted with reckless indifference to human life. Petitioner also opposed the request for judicial notice on the

ground the trial transcripts were not part of the court file and, on that basis, argued no evidence was adduced to prove he could still be convicted of murder.

The matter was heard on February 2, 2024, and March 1, 2024. At the outset of the February 2, 2024 hearing, the court stated it had reviewed the trial transcripts. The People argued against the petition and rested. Petitioner argued the request for judicial notice was defective and, therefore, the People had presented no evidence to meet their burden to prove he was guilty of murder. During argument on this point, the court clarified, "I'm not relying on the preliminary hearing transcript." The court ultimately continued the hearing to allow for further briefing and argument.

Thereafter, the People filed a brief titled, "Declaration and Brief in Support of Judicial Notice of the Trial Transcript." (Some capitalization omitted.) Therein, the People stated, "The court records and record of conviction of [petitioner] including the preliminary hearing transcripts are matters which the court could properly take judicial notice of, and the [P]eople so request, for the evidentiary hearing of this matter." The People also submitted a declaration and exhibit reflecting that the court and defense counsel previously were sent an electronic copy of the trial and preliminary hearing transcripts in advance of the evidentiary hearing.

At the continued hearing on March 1, 2024, the court overruled petitioner's objection to the court taking judicial notice of the trial transcripts. Petitioner's counsel argued that the preliminary hearing transcript was not "the same as a trial transcript[]," and the court agreed. The preliminary hearing transcript was not judicially noticed or entered into evidence. The court judicially noticed the trial transcript and determined it was properly admitted. Petitioner's counsel then argued the merits of this case.

On March 22, 2024, the court denied the petition by written order, finding beyond a reasonable doubt that petitioner is guilty of murder "under the latest felony murder rule," and therefore ineligible for resentencing. The court stated its ruling was based on "the evidence offered at the hearing on this matter." The court's factual summary

11.

tracked, nearly verbatim, the language of this court's opinion in *Contreras*, *supra*, F047366, although the court omitted some material favorable to petitioner that was included in this court's prior opinion. The court found the murder occurred during the commission of a robbery and burglary and that petitioner was a major participant in the robbery, burglary, and murder who acted with reckless indifference to human life. The court made the following specific findings regarding the factors enumerated in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*), and *People v. Clark* (2016) 63 Cal.4th 522, 614–623 (*Clark*):

> **"A. [Petitioner] was a major participant in the underlying robbery.**
>
> **"What was [petitioner's] role in planning the crime that led to the deaths?**
>
> "The evidence at trial shows beyond a reasonable doubt that [p]etitioner was the instigator of the underlying crime of robbing the victim by 'knocking him out' and 'fucking' him up. Petitioner proposed this crime to his [coperpetrators] because he believed the victim had marijuana in his motel room. The crime was discussed with at least [coperpetrator] Carlos, including that they would 'knock out' the victim so they could take his drugs and money.
>
> **"What was [petitioner's] role in supplying or using lethal weapons?**
>
> "The only testimony presented at trial as to this issue [is] [p]etitioner's own testimony. Although [p]etitioner testified no weapon was brought into the motel room, the plan was to 'knock out' the victim, implying a weapon would be used. The testimony therefore shows the weapon would be simply anything found in the motel room. As the People point out, however, [p]etitioner stated he took the bat out of the motel room because it had his finger prints on it. This suggests [p]etitioner could have handed the bat to the other [coperpetrator] for use.
>
> **"What did [petitioner] know about dangers posed by the crime, any weapons used, or past experience or conduct of other participants?**
>
> "Petitioner agreed prior to entering the motel room that the plan would be to hit the victim in the head, in order to 'knock him out.' Any reasonable

12.

person would know the danger of striking someone in the head with a blunt object hard enough to lose consciousness. The testimony at trial also indicated the [p]etitioner was aware of his [coperpetrator]'s alleged violent conduct. Petitioner was present when [his] [coperpetrator] allegedly stabbed another man earlier on the same day as this crime. Petitioner was well aware of the dangers of the crime and past conduct of the other participant 'Carlos.'

**"Was [petitioner] in a position to facilitate or prevent the death?**

"[Petitioner] was in the room when the victim was beaten to death. He did nothing to prevent his [coperpetrator] from locating another weapon, and continuing the attack after the first strike with a hammer. The Court agrees with the prosecution that [p]etitioner suggested this crime to Carlos, knowing his propensity for violence, and suggested they hit the victim over the head in order to rob the victim. This facilitated the victim's death.

**"Did [petitioner's] action or inaction play a role in the death?**

"Petitioner was the instigator of the robbery underlying this murder. His proposed course of action was to injure the victim sufficient to at least knock him out, and 'fuck him up' so that the [coperpetrators] could steal his money, personal items, and marijuana. These actions created a situation which was inherently dangerous to human life. Petitioner's inaction of course consisted of not calling off the plan either entirely, or in part. He also made no attempt to stop the beating after the first strike, nor render any aid. He also failed to notify the police of what occurred.

**"What did [petitioner] do after lethal force was used?**

"As pointed out by the People, [p]etitioner destroyed evidence after lethal force was used by taking the bat. He knew it had his fingerprints on it. After the killing, [p]etitioner ransacked the motel room, and took drugs, money, jewelry, and other items. He locked the door to prevent discovery of the victim. Petitioner returned several times to the motel in attempts to persuade witness not to speak to police. As enumerated above, these attempts involved both offers of money, and implied threats of violence.

"The Court finds beyond a reasonable doubt all the above factors indicate [p]etitioner was a major participant in the underlying crime.

> **"B. The Petitioner acted with reckless indifference to human life as he knowingly engaged in criminal activity that he knew involved a grave risk of death**

13.

"The Court considered the following factors in this finding:

**"Did the Petitioner know that a lethal weapon would be present during the robbery?**

"The Court agrees that the [p]etitioner intended to 'knock out' the victim and the evidence shows a hammer and bat were used. Although [p]etitioner and a [coperpetrator] located the weapon in the motel room, it is clear they intended to use any object that could be found on hand to assault and rob the victim. A bat or a hammer located on site can be lethal, as shown in this case.

**"Did the Petitioner know that a lethal weapon was likely to be used?**

"Petitioner was planning on 'fucking up' the victim and was going to 'knock him out.' In order to knock him out, he was going to be hit in the head with something. It is likely that a lethal weapon would have to be used.

**"Did the Petitioner know that a lethal weapon was used?**

"The short answer to this question is yes, as [p]etitioner was at the scene of the robbery/burglary and witnessed the beating and stabbing of the victim. Petitioner himself removed the deadly weapon (bat) from the scene of the crime.

**"Did the Petitioner know the number of weapons involved?**

"As in the previous factor, [p]etitioner witnessed the attack with hammer, the bat, and the knife.

**"Was the Petitioner near the person killed when the killing occurred?**

"Petitioner was in the same room mere feet away. He told police he had just taken a hit from the victim's pipe when the attack occurred, which the victim had handed him. His clothes were also spattered with the victim's blood.

**"Did the Petitioner have an opportunity to stop the killing or help the victim?**

"The [p]etitioner could have stepped in after the first hammer blow, while the [coperpetrator] was looking for another suitable weapon. He could have told the [coperpetrator] they should not knock the victim out before carrying out this crime. If the intent was to only 'knock out' the victim, he

14.

would have been able to identify the perpetrators whether he had been just 'knocked out', or merely threatened to obtain his property. Petitioner could have called law enforcement or an ambulance after the crime.

**"How long did the crime last?**

"The Court agrees with the Prosecution that the inception of this crime until its commission was at least thirty minutes to an hour. At any time [p]etitioner could have called it off, or decided to not participate.

**"Was the Petitioner aware of anything that would make a coparticipant likely to kill?**

"Petitioner was present during an earlier incident with [coperpetrator] Carlos wherein Carlos allegedly stabbed a man during a parking lot altercation. This occurred on the same day. Petitioner was aware of Carlos' violent tendencies and actions which could lead to another person's death. The Court agrees that by [p]etitioner admitting he and Carlos planned to assault the victim while carrying out the robbery, [p]etitioner knew there was a possibility the victim could be killed during the assault to 'knock him out' and 'fuck him up.'

**"Did the Petitioner try to minimize the possibility of violence?**

"The Court finds [p]etitioner did nothing to minimize the possibility of violence. Indeed, the plan was to violently assault the victim and rob him of his belongings. During the beating, [p]etitioner did nothing to stop it. Petitioner admitted to the police that the plan was to 'knock out' the victim and rob him.

"The Court finds, beyond a reasonable doubt, that [p]etitioner acted with reckless disregard for human life."

This timely appeal followed.

## DISCUSSION

### I. Section 1172.6 Procedure

Effective January 1, 2019, Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill No. 1437) "altered the substantive law of murder in two areas." (*People v. Curiel* (2023) 15 Cal.5th 433, 448 (*Curiel*).) First, the bill narrowed the scope of the felony-murder rule "so that a 'participant in the perpetration or attempted perpetration of a

15.

[specified felony] in which a death occurs' can be liable for murder only if '[t]he person was the actual killer'; '[t]he person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree'; or '[t]he person was a major participant in the underlying felony and acted with reckless indifference to human life.' " (*People v. Arellano* (2024) 16 Cal.5th 457, 467–468, quoting § 189, subd. (e)(1)–(3).) Second, the bill "eliminate[d] liability for murder as an aider and abettor under the natural and probable consequences doctrine" by requiring that, "except in cases of felony murder, 'a principal in a crime shall act with malice aforethought' to be convicted of murder." (*Curiel*, at p. 449, quoting § 188, subd. (a)(3).) Now, " '[m]alice shall not be imputed to a person based solely on his or her participation in a crime.' " (*Curiel*, at p. 449.)

Additionally, Senate Bill No. 1437 added former section 1170.95, now section 1172.6, to provide a procedure for those convicted of a qualifying offense " 'to seek relief' where the two substantive changes described above affect a defendant's conviction." (*Curiel*, *supra*, 15 Cal.5th at p. 449.) Under section 1172.6, an offender seeking resentencing must first file a petition in the sentencing court, and the sentencing court must determine whether the petitioner has made a prima facie showing that he or she is entitled to relief. (§ 1172.6, subds. (a)–(c); accord, *People v. Strong* (2022) 13 Cal.5th 698, 708.) If the sentencing court determines the petitioner has made a prima facie showing, the court must issue an order to show cause and hold a hearing to determine whether to vacate the murder conviction. (§ 1172.6, subds. (c), (d)(1).)

At this evidentiary hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder . . . under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).) "The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence

previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion." (*Ibid.*)

## II. Felony Murder Under Current Law

Section 189, subdivision (e)(3) provides that a participant in a qualifying felony where a death occurs may be liable for murder if the person was "a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." Section 190.2 "identifies the circumstances under which murderers and accomplices can be punished by death or life imprisonment without parole. . . . For defendants who did not kill and lacked intent to kill, section 190.2, subdivision (d) permits such punishment only if they acted 'with reckless indifference to human life and as a major participant' [in] a qualifying felony like robbery." (*People v. Douglas* (2020) 56 Cal.App.5th 1, 7; see *In re Scoggins* (2020) 9 Cal.5th 667, 674 (*Scoggins*).)

"[T]he major participant and reckless indifference concepts trace their origin to a pair of United States Supreme Court decisions—*Enmund v. Florida* (1982) 458 U.S. 782 and *Tison v. Arizona* (1987) 481 U.S. 137—that articulate the constitutional limits of capital punishment for accomplices to felony murder." (*Emanuel*, *supra*, 17 Cal.5th at p. 882.) "In *Enmund*, the [United States Supreme Court] held that a minor participant in an armed robbery (the getaway driver), who neither intended to kill nor had any other culpable mental state, was ineligible for the death penalty. [Citations.] A few years later, the [United States Supreme Court] revisited the issue in *Tison*, considering the case of defendants who broke two convicted murderers out of prison, armed the escaped prisoners, captured and then held a family of passing motorists at gunpoint while the escapees deliberated whether to kill them, and then abandoned the victims in the remote

desert after the escapees shot them. [Citation.] The court held that 'major participation in the felony committed, combined with reckless indifference to human life,' provides a sufficient degree of culpability to be eligible for a sentence of death. [Citation.] Section 190.2, subdivision (d), added by voter initiative in 1990 (Prop. 115, as approved by voters, Primary Elec. (June 5, 1990) § 10) was designed to codify the holding of *Tison* and, by extension, the related holding of *Enmund*." (*Emanuel*, at p. 882.)

Following *Enmund* and *Tison*, the California Supreme Court "endeavored to elucidate the contours of the major participant and reckless indifference standards" in *Banks*, *supra*, 61 Cal.4th 788 and *Clark*, *supra*, 63 Cal.4th 522. (*Emanuel*, *supra*, 17 Cal.5th at p. 882.) In *Banks*, our Supreme Court identified the following nonexhaustive factors as relevant to the major participation inquiry: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Banks*, at p. 803, fn. omitted.) However, the court explained, "[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient." (*Ibid*.)

Subsequently, in *Clark*, the high court addressed the "reckless indifference" standard. The court explained that reckless indifference to human life "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Clark*, *supra*, 63 Cal.4th at p. 617.) The court further explained that reckless indifference to human life has both a subjective and an objective component. (*Ibid*.) Subjectively, "[t]he defendant must be aware of and willingly involved in the violent manner in which the

18.

particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create." (*Banks*, *supra*, 61 Cal.4th at p. 801; accord, *Clark*, at p. 617.) Objectively, " '[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.' " (*Clark*, at p. 617.)

In *Clark*, the high court provided the following nonexhaustive list of factors to be considered in determining whether the defendant acted with reckless indifference: (1) knowledge of weapons, and use and number of weapons; (2) physical presence at the crime and opportunities to restrain the crime and/or aid the victim; (3) duration of the felony and period of interaction between the perpetrators and the victims; (4) the defendant's knowledge of his or her cohort's likelihood of killing; and (5) the defendant's efforts to minimize the risk of violence during the felony. (*Clark*, *supra*, 63 Cal.4th at pp. 618–623.) Like the factors considered in *Banks*, " '[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient.' " (*Clark*, at p. 618.)

Our Supreme Court has explained, "[t]he degree of risk to human life is crucial to the [reckless indifference] analysis." (*Scoggins*, *supra*, 9 Cal.5th at p. 682.) " 'Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' to establish reckless indifference to human life; 'only knowingly creating a "grave risk of death" ' satisfies the statutory requirement." (*Id.* at p. 677.) Our Supreme Court "has thus made clear that participation in a ' "garden-variety armed robbery," ' i.e., one in which the only factor supporting a reckless indifference finding is that a participant was armed with a gun, is insufficient without more to establish reckless indifference." (*Emanuel*, *supra*, 17 Cal.5th at p. 884.) "The 'totality of the circumstances' must be analyzed to determine whether the defendant acted with reckless indifference." (*Id.* at p. 885.)

## III. Consideration of Preliminary Hearing Evidence

Petitioner initially argued the court prejudicially erred in considering evidence admitted at his preliminary hearing but excluded at trial, which suggested petitioner was with Carlos when Carlos stabbed someone at a market two hours before Loveland's murder. Petitioner argued section 1172.6, subdivision (d)(3) reflects a legislative intent to exclude from the evidentiary hearing evidence that has been excluded from trial. He further argued defense counsel was ineffective in failing to object to the prosecution's reliance on this evidence at the evidentiary hearing.

In supplemental briefing, petitioner asserts the court did not judicially notice or admit any evidence to support the finding that petitioner was present at the earlier stabbing. He therefore contends the court prejudicially erred in relying on this evidence to find he was a major participant in the robbery and acted with reckless indifference to human life.

As we explain, evidence of petitioner's presence at the prior stabbing was adduced only at the preliminary hearing, and the court expressly declined to consider preliminary hearing evidence at the evidentiary hearing. Accordingly, the court erred in relying on evidence of petitioner's presence at the earlier stabbing to conclude he was a major participant who acted with reckless indifference to human life. Because the error was prejudicial, we reverse.

### A. Additional Background

At petitioner's preliminary hearing, Cotton testified that, in petitioner's second statement to law enforcement, petitioner reported he was present when Carlos stabbed someone at a market two hours prior to Loveland's murder. At trial, however, the court excluded this portion of petitioner's interview with law enforcement from a videotape the defense played for the jury, explaining: "That is unduly prejudicial to the jury, to the

20.

[petitioner], and also adds issues in matters that are put before the jury that should not be put before the jury."[4]

In the trial brief submitted by the People in advance of the evidentiary hearing, the People relied on both trial and preliminary hearing evidence. The People argued petitioner's presence at the stabbing by Carlos on the day of the murder supported several of the *Banks* and *Clark* factors relating to major participation and reckless indifference, including petitioner being in a position to facilitate or prevent the death, his awareness that Carlos was capable of and likely to engage in violent behavior, and petitioner's lack of efforts to minimize the possibility of violence. However, the People did not initially request judicial notice of the preliminary hearing transcript. The trial court stated at the evidentiary hearing that it was not relying on the preliminary hearing evidence. The People's later declaration and brief in support of its request for judicial notice requested judicial notice of the preliminary hearing transcript in the body of the brief, although not in the caption. Ultimately, however, the preliminary hearing transcript was not admitted or judicially noticed.

Nonetheless, the trial court's written ruling, which substantially tracked the People's brief, relied on petitioner's presence at the earlier stabbing to support its findings of major participation and reckless indifference. Specifically, in its major participation finding, the court noted, "The testimony at trial[5] also indicated the [p]etitioner was aware of his [coperpetrator]'s alleged violent conduct. Petitioner was present when [his coperpetrator] allegedly stabbed another man earlier on the same day as this crime. Petitioner was well aware of the dangers of the crime and past conduct of the other participant 'Carlos.' " The court further noted that petitioner "suggested this [robbery] to

---

[4] Neither the recording of the interview played for the jury nor a transcript of the interview is contained in the record on appeal, and it does not appear these records were before the trial court at the evidentiary hearing.

[5] Again, this evidence was not admitted at trial, but at the preliminary hearing.

21.

Carlos, knowing his propensity for violence." In its reckless indifference finding, the court noted, "Petitioner was present during an earlier incident with [coperpetrator] Carlos wherein Carlos allegedly stabbed a man during a parking lot altercation. This occurred on the same day. Petitioner was aware of Carlos' violent tendencies and actions which could lead to another person's death."

### B. Forfeiture

The People contend petitioner forfeited an objection to the court's reliance on facts not in evidence. Specifically, the People contend, "Although defense counsel objected to judicial notice of the preliminary hearing transcript [citation], he never objected that this evidence itself was not admitted because it came from that transcript."

The court stated it was not relying on the preliminary hearing transcript and gave no indication it intended to deviate from that decision. As such, petitioner had no further obligation to object to this evidence. We disagree with the People's apparent contention that petitioner was required to point out to the court that the People's argument relied in part on facts the court declined to admit.

Accordingly, we address the argument on the merits.

### C. The Court's Finding that Petitioner Was Present at the Prior Stabbing Is Unsupported by the Evidence

The People concede that the record does not reflect the court took judicial notice of the preliminary hearing transcript and instead expressly stated it was not relying on the preliminary hearing transcript. Nonetheless, the People suggest there is "some evidence of the stabbing incident" (boldface omitted) in the record because "the trial transcript included a brief discussion of the stabbing incident between the court and the parties." The People therefore seemingly suggest the court's statement describing the evidence excluded from trial constitutes substantive evidence of the excluded facts. This assertion is unsupported by any legal authority.

22.

Section 1172.6, subdivision (d)(3) provides that the admission of evidence at the evidentiary hearing generally is governed by the Evidence Code. With some limited exceptions, the court also may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony. (§ 1172.6, subd. (d)(3).) A court's statements describing excluded evidence do not fall within either of these categories. That is, the court's statements are neither admissible evidence, nor previously admitted evidence. The statements do not constitute substantive evidence that petitioner was present at the earlier stabbing.

Accordingly, the court's findings regarding petitioner's presence at the earlier stabbing are unsupported by evidence admitted at the evidentiary hearing.

**D. The Court's Reliance on Unadmitted Evidence Was Prejudicial**

We conclude the court's reliance on unadmitted evidence of petitioner's presence at the prior stabbing was prejudicial.

We review petitioner's claim of prejudice under the standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Lynch* (2024) 16 Cal.5th 730, 755 ["We apply the *Watson* test to errors of state law that do not rise to the level of federal constitutional error."]; cf. *People v. Rodriguez* (2024) 103 Cal.App.5th 451, 459 [applying *Watson* test to errors relating to the court's role in the § 1172.6 evidentiary hearing].) "Under the *Watson* test, an error is harmless unless it is 'reasonably probable' the outcome would have been different in the absence of the error." (*People v. Lynch*, at p. 755.)

Here, the court relied on the unadmitted evidence of petitioner's presence at the prior stabbing to support its findings that petitioner was a major participant in the robbery who acted with reckless indifference to human life. This evidence bore significantly on both findings because the court determined from this evidence that petitioner was aware, at the time he planned the robbery, of Carlos's tendency to resort to violence.

23.

Nonetheless, it is likely the court would have found petitioner was a major participant in the robbery regardless of the unadmitted evidence because the evidence showed petitioner instigated the robbery, was present when it occurred, and participated in removing the victim's items from the room.

However, we conclude it is reasonably probable that the court would not have found petitioner acted with reckless indifference to human life absent the unadmitted evidence. The evidence established that petitioner planned to engage in an unarmed assault and robbery. However, a planned assault, even if severe, is not necessarily sufficient to support a finding of reckless indifference. (*Scoggins*, *supra*, 9 Cal.5th at pp. 681–682 [plan to " 'beat the shit' " out of the victim does not establish a defendant was aware of his coperpetrator's likelihood of killing or support a finding of reckless indifference to human life].) Absent petitioner's knowledge of heightened risks associated with committing a robbery with Carlos, "nothing in the plan . . . 'elevated the risk to human life beyond those risks inherent in any armed robbery,' much less a planned unarmed robbery." (*Emanuel*, *supra*, 17 Cal.5th at p. 895.) Meanwhile, the unadmitted evidence suggested petitioner had nearly contemporaneous, first-hand knowledge of Carlos's willingness to employ a deadly weapon. The unadmitted evidence therefore suggested petitioner knew Carlos would be willing to resort to deadly violence to effectuate the robbery. Although the court relied on several other factors to support its reckless indifference finding, this factor was the most salient.[6] There is no question this evidence informed the court's reckless indifference finding, and we conclude it is reasonably probable the court would not have found petitioner acted with reckless indifference to human life absent the unadmitted evidence.

---

[6] Additionally, as we explain below, the court's analysis of several of the other relevant factors does not comport with our Supreme Court's recent guidance in *Emanuel*.

24.

Nonetheless, the People contend the court's consideration of the unadmitted evidence was harmless because the unadmitted evidence was admissible. The People thereby seemingly suggest the court could have or should have admitted the preliminary hearing transcript. We acknowledge that the record does not provide a satisfying explanation of how or why the court rejected the preliminary hearing transcript while also relying on evidence contained only therein and misattributing this evidence to the trial transcript. However, we note that the People did not initially seek judicial notice of the preliminary hearing transcript and only later included this request in passing in the body of a second brief supporting their initial request for judicial notice of the trial transcript.[7] Ultimately, the court declined to admit or judicially notice the preliminary hearing transcript and did not state its reason for doing so. Neither party has suggested the court abused its discretion in declining to admit this evidence and we have no basis to conclude the court would admit the evidence if given another opportunity to do so. We cannot conclude the error was harmless on the ground the court could have but did not admit the evidence. We also reject as unpersuasive the People's reliance on *People v. Valdez* (1997) 58 Cal.App.4th 494, 511, which involved a lack of prejudice arising from inadmissible, but cumulative, evidence. Here, no other admitted evidence established petitioner's presence at the prior stabbing.

In sum, because the court's reliance on unadmitted evidence was prejudicial, the order denying the petition for resentencing must be reversed.

---

[7] We also acknowledge petitioner's argument that the state of the record could give rise to an inference that the court did not base each of its factual findings on an independent review of the evidence, as required by section 1172.6, subdivision (d)(3). In this regard, we note the court's recitation of the facts was taken from this court's prior opinion, the court's analysis relied largely on the facts set forth in the People's brief, including the facts regarding the prior stabbing, and, as stated, the court misattributed the source of the evidence regarding petitioner's presence at the prior stabbing, all of which could suggest the court did not conduct a detailed review of the trial testimony supporting all its findings.

**IV.    The Evidence Is Insufficient To Support the Court's Reckless Indifference Finding**

We conclude the remaining evidence is insufficient to support the court's finding that petitioner acted with reckless indifference to human life.

We review the court's findings for substantial evidence.  (*People v. Reyes* (2023) 14 Cal.5th 981, 988.)  "Under this standard, 'we review the record " ' "in the light most favorable to the judgment below to determine whether it discloses substantial evidence— that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact" ' " ' could find beyond a reasonable doubt that [petitioner] acted with reckless indifference."[8]  (*Emanuel*, *supra*, 17 Cal.5th at p. 885.)

Our Supreme Court has urged reviewing courts to "take care to consider the presence or absence of evidence relating to each relevant factor [pertaining to major participation and reckless indifference] on its own merits before considering the evidence in its totality."  (*Emanuel*, *supra*, 17 Cal.5th at p. 888.)  Accordingly, we review each of the relevant *Clark* factors in turn before evaluating the totality of the circumstances bearing on petitioner's mental state.

**A.    Use of or Awareness of the Presence of Weapons**

The court did not rely on the unadmitted evidence to support this *Clark* factor. The court found the hammer and bat used in the murder were lethal weapons, which were found by the perpetrators in the hotel room.  Nonetheless, the court also found petitioner intended to use "any object that could be found on hand" to commit the robbery by hitting the victim on the head with something sufficient to knock him out.  These findings are unaffected by the court's reliance on unadmitted evidence.  However, there is no

---

[8] Although petitioner asserts the record does not contain substantial evidence that he was a " 'major participant' who acted 'with reckless indifference to human life' " (capitalization omitted), his argument addresses only the reckless indifference finding. We therefore do not consider whether the evidence was sufficient to support a finding that petitioner was a major participant in the robbery.

evidence petitioner and Carlos planned to use an object or weapon, let alone a deadly weapon, to carry out the crime. The court's findings and the evidence reflect only that petitioner was aware some use of force was likely. (See *Emanuel*, *supra*, 17 Cal.5th at p. 885.) As we discuss further below, a planned assault is not necessarily sufficient to support a reckless indifference finding. This factor therefore does not weigh in favor of a finding of reckless indifference.

**B.      Knowledge of Cohort's Likelihood of Killing**

The court relied on two facts to find petitioner had knowledge of his coperpetrator's likelihood of killing. The first fact was petitioner's presence at the earlier stabbing, from which petitioner may have gained awareness of Carlos's tendency toward potentially lethal violence. The second fact was petitioner's plan with Carlos to assault the victim during the robbery. On the latter point, the court concluded "[p]etitioner knew there was *a possibility the victim could be killed* during the assault." (Italics added.)

As stated, the evidence suggests petitioner, who was unarmed, planned to engage in an assault and robbery. There is no evidence petitioner planned to use a weapon to knock Loveland out or that he knew he or his companions would encounter lethal weapons within the room. Without more, a planned assault, even if severe, is not sufficient to support a finding of reckless indifference. (*Scoggins*, *supra*, 9 Cal.5th at pp. 681–682.) This is because the " '[a]wareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient'; reckless indifference to human life requires 'knowingly creating a "*grave risk of death*." ' [Citation.] The degree of risk to human life is crucial to the analysis." (*Id*. at p. 682.) In this regard, the court's finding that petitioner was aware Loveland "could be killed" by a blow to the head does not suggest petitioner was aware the assault carried a grave risk of death. The evidence " 'does not suggest an elevated risk to human life beyond those risks inherent in an unarmed beating and robbery.' " (*Ibid*.)

27.

Petitioner's presence at the prior stabbing may have informed petitioner that committing the crime with Carlos carried a heightened risk of death, beyond that otherwise inherent in an unarmed assault and robbery. However, evidence of petitioner's presence at the prior stabbing was not admitted and, without it, the remaining evidence does not suggest petitioner was aware Carlos was likely to escalate the assault by procuring a lethal weapon, bludgeoning Loveland multiple times, or using force in excess of that necessary to render Loveland unconscious.

We acknowledge there was some testimony from the defense forensic psychologist regarding a prior stabbing by Carlos. The forensic psychologist testified: "The problem is that the anxiety was also triggered because *apparently [petitioner] knew that Carlos was rumored or alleged or suspected to have stabbed somebody else some weeks before* and so he was afraid of him. So, honestly, in two interviews I couldn't separate out which of that was being afraid of and which of that was not wanting to look foolish or weak or, you know, so and so." (Italics added.) Knowledge that Carlos was "rumored or alleged or suspected" to have stabbed someone some weeks prior would suggest that petitioner knew Carlos was willing to resort to violence. Although this evidence is not as probative as the unadmitted evidence suggesting petitioner was present at a stabbing immediately before the murder, such knowledge renders petitioner more culpable than someone who is entirely unaware of a coparticipant's propensity for violence. (*People v. Saibu* (2022) 81 Cal.App.5th 709, 740.) At the same time, even if petitioner knew Carlos had a history of violence and even if the planned assault and robbery contemplated the use of violence, it remains that petitioner and Carlos planned to engage in an unarmed robbery. (*Scoggins*, *supra*, 9 Cal.5th at p. 682.) Thus, while we acknowledge that the psychologist's testimony tends to tip this factor in favor of a finding of reckless indifference, it is not sufficient on its own to show petitioner knew committing this unarmed crime with Carlos carried a grave risk of death. (*Ibid.*)

28.

## C.     Duration of Crime

The court did not rely on the unadmitted evidence to support this *Clark* factor. The court found that the crime lasted between 30 minutes to one hour, from "inception" until commission.[9]  However, our Supreme Court recently clarified that this factor focuses on "the period of the violent confrontation." (*Emanuel*, *supra*, 17 Cal.5th at p. 886.)  Here, Elena testified that Jesse stayed with her in the carport for "[a] couple of minutes" after Carlos and petitioner left to go to Loveland's room.  Petitioner testified that Jesse entered the motel room "[a]bout two minutes" after the beating.  Petitioner estimated he and his coparticipants spent 10 minutes in the motel room after the beating. Elena encountered all three coparticipants behind the motel approximately eight minutes after Jesse departed the carport.  Accordingly, it is apparent that the period of violent confrontation was brief.  The effect of this factor on the ultimate reckless indifference finding is therefore neutral.  (*Ibid.*)

## D.     Efforts To Minimize the Risk of Violence

The court did not rely on the unadmitted evidence to support this *Clark* factor. The court found petitioner took no action to minimize the risk of violence but rather planned to assault the victim and did not intervene to stop the assault.

Our Supreme Court recently clarified that this factor focuses on facts relevant to the minimization of risk during the *planning stage*, rather than during the crime itself. (*Emanuel*, *supra*, 17 Cal.5th at pp. 887–888.)  Additionally, "the absence of [efforts to minimize the risk of violence] does not necessarily evince a subjective disregard for risk where the objective circumstances of the planned crime suggest the risk of violence

---

[9] The court did not provide citations or other references to the evidence to explain how it reached this calculation.  However, it appears to be derived from the People's brief, which calculated the inception of the offense from the time "[t]he crime of conspiracy to commit robbery began."  The People noted the perpetrators first encountered Loveland around 11:00 p.m. and the robbery occurred "sometime after midnight."  It therefore is clear that this calculation is not limited to the period of violent confrontation.

posed is no more than that inherent in any violent felony," particularly where "the planned crime does not involve the use of weapons." (*Id.* at p. 888.) The very fact that the planned crime does not involve the use of weapons is, in itself, considered " ' "a significant step towards minimizing the likelihood that the plan would result in a 'grave risk of death.' " ' " (*Id.* at p. 887.)

Here, the court found that petitioner planned to violently assault the victim. However, as stated, there is no evidence that the planned crime involved the use of weapons. This aspect of the plan tended to minimize the risk of death. At the same time, the plan involved assaulting and robbing Loveland in his room, rather than in a public location where the presence of witnesses might have kept petitioner's coperpetrators within the bounds of the original plan. (See *Emanuel*, *supra*, 17 Cal.5th at p. 887 [" 'the commission of the crime during daylight hours in public view may have had the potential for minimizing violence' "].) The planned location of the robbery tended to heighten the risks involved in the crime. In light of these countervailing factors, we conclude this factor weighs slightly in favor of a finding of reckless indifference.

### E. Physical Presence at the Scene and Opportunity To Restrain Confederates or Aid Victims

The court did not rely on the unadmitted evidence to support this *Clark* factor. The court found petitioner was in the room and in close proximity to the attack. The court also found petitioner could have, but did not, "step[] in after the first hammer blow, while [Carlos] was looking for another suitable weapon." The court also found petitioner could have called law enforcement or an ambulance after the crime.

Our Supreme Court recently emphasized this factor focuses on "what [the defendant's] actions reveal about his [or her] mental state" and whether he or she acted with the requisite mens rea. (*Emanuel*, *supra*, 17 Cal.5th at p. 891.) " 'Proximity to the murder and the events leading up to it may be particularly significant where . . . the murder is a culmination or a foreseeable result of several intermediate steps, or where the

[co]participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force. In such cases, "the defendant's presence allows him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental state. . . . [Moreover,] the defendant's presence gives him an opportunity to act as a restraining influence on murderous cohorts. If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders." ' " (*Id.* at p. 889.)

However, "where a crime unfolds quickly, this factor—the failure to restrain a cohort—cannot be said to weigh in favor of a finding of reckless indifference without some evidence in the record indicating that the defendant had a meaningful opportunity to do so. [Citation.] This requires some awareness of the risk of impending lethal violence *and time to react*." (*Emanuel*, *supra*, 17 Cal.5th at p. 892, italics added.) Furthermore, a defendant's failure to intervene is relevant to this inquiry only to the extent it "reflect[s] intentional inaction indicative of reckless indifference to human life," (*id.* at p. 891), rather than a lack of control over the rapidly unfolding actions of a confederate (*id.* at p. 892).

Finally, our Supreme Court has acknowledged that "a defendant's conduct following the use of lethal force may be reflective of his or her mental state during the offense." (*Emanuel*, *supra*, 17 Cal.5th at p. 893.) However, " 'when different inferences may be drawn from the circumstances, the defendant's actions after the [killing] may not be very probative of his mental state.' " (*Ibid.*) In particular, fleeing the scene, which may reflect an intent merely to avoid arrest, is not highly probative. (*Id.* at pp. 893–894.)

Here, there is no question petitioner was in close proximity to the robbery and murder. However, as we have explained, absent the unadmitted evidence, there is little to suggest petitioner was aware that committing this crime with Carlos posed a grave risk of death. Nor does it appear the murder was the foreseeable consequence of several intermediate steps in which petitioner had a meaningful opportunity to intervene,

31.

inasmuch as the petitioner and Loveland were smoking marijuana together when Carlos assaulted Loveland with the hammer.

The court noted petitioner could have stepped in between the hammer blow and Carlos obtaining the bat. However, the testimony on this point suggests the period of violent confrontation was brief and Carlos picked up the bat in short order once the hammer broke. The record does not suggest petitioner had a meaningful opportunity to restrain or distract Carlos or abandon the scene of the crime during this brief interval. Nor did petitioner take any action to suggest he was willing to engage in further violence to accomplish the aims of the robbery once the assault began.

Additionally, while we agree petitioner did not summon aid for Loveland, petitioner also determined Loveland had no pulse and, in the days following the murder, expressed his belief that Loveland was dead. Thus, petitioner's conduct after the use of force, i.e., departing the scene without summoning aid for a victim he believed to be dead, is too ambiguous to be highly probative of whether petitioner acted with reckless indifference when the killing occurred. (See *Emanuel*, *supra*, 17 Cal.5th at pp. 893–894.)

## F.      Totality of the Circumstances

As we have now stated repeatedly, the evidence establishes petitioner planned with Carlos to " 'knock out' " and rob the victim in his motel room. Both petitioner and Carlos were unarmed, and the record does not suggest that any use of weapons was discussed as part of the plan. Carlos quickly escalated to deadly violence without a meaningful opportunity for petitioner to intervene. Although the record reflects petitioner was aware Carlos had some history of violence, the facts do not suggest petitioner had reason to believe Carlos would exceed the bounds of the plan which, again, involved an unarmed robbery.

Ultimately, the question before us in reviewing the totality of the circumstances is whether factors relating to the crime or the coparticipants reflect that petitioner knew of

and disregarded a " ' "grave risk of death," ' " which is a risk beyond the dangers inherent in any violent felony. (*Emanuel*, *supra*, 17 Cal.5th at p. 883; see *id.* at pp. 895–896; accord, *Clark*, *supra*, 63 Cal.4th at p. 623.) Here, given the circumstances of the offense—particularly the lack of weapons and Carlos's rapid escalation to deadly violence—and the "relative paucity of other evidence to support a finding of reckless indifference to human life," we conclude the evidence admitted by the trial court was insufficient to support the court's finding that petitioner is guilty of murder under this theory. (*Clark*, at p. 623.)

## V. Proceedings on Remand

The parties disagree regarding the extent of appropriate proceedings on remand. Relying on *Emanuel*, petitioner contends the only appropriate remedy is remand with directions to vacate the murder conviction and resentence him. The People contend the proper remedy is remand for a new evidentiary hearing.

In *Emanuel*, the high court held the evidence was insufficient to support the trial court's finding that the petitioner acted with reckless indifference to human life. Accordingly, the court reversed with directions to remand the case to the trial court with instructions to grant the petition for resentencing, vacate the murder conviction, and resentence the petitioner. (*Emanuel*, *supra*, 17 Cal.5th at p. 896.) However, our holding here is distinct from *Emanuel* in one significant respect. Where *Emanuel* was reversed solely for insufficient evidence, the court here also prejudicially erred in relying on unadmitted evidence. Confoundingly, the court excluded from the evidentiary hearing the very evidence it purported to rely on.

On appeal from this proceeding subsequent to a final judgment, we have wide latitude in selecting an appropriate disposition, and our authority includes the ability to "remand the cause to the trial court for such further proceedings as may be just under the circumstances." (§ 1260.) In the very unusual circumstances presented here, we

33.

conclude it is appropriate and just to permit the court to conduct a new evidentiary hearing on remand, at which it considers only evidence admitted or judicially noticed pursuant to section 1172.6, subdivision (d)(3). We are reminded that section 1172.6 is an act of legislative lenity (*People v. Hill* (2024) 100 Cal.App.5th 1055, 1067), and its purposes are not served by affording resentencing to petitioners solely because the court or the parties were mistaken regarding the evidence that was admitted. Moreover, as the People note, " 'double jeopardy principles are not at stake' in a section [1172.6] proceeding" (*People v. Cooper* (2022) 77 Cal.App.5th 393, 412), and do not bar the People from pursuing a new evidentiary hearing on remand.[10]

## VI.  Other Considerations on Remand

### A.  Consideration of Preliminary Hearing Evidence

Petitioner contends section 1172.6, subdivision (d)(3) reflects a legislative intent to exclude from the evidentiary hearing evidence, such as the evidence of petitioner's presence at the earlier stabbing, that has been excluded from trial. We address this issue to the limited extent necessary to provide guidance on remand. We disagree with petitioner's contention that section 1172.6 categorically bars consideration of evidence that was excluded at trial.

This issue presents a question of statutory interpretation, which we review de novo. (*People v. Lewis* (2021) 11 Cal.5th 952, 961.) Section 1172.6, subdivision (d)(3) provides that the admission of evidence at the evidentiary hearing generally is governed by the Evidence Code. However, the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness

---

[10] However, to the extent the People fail to present additional evidence at an evidentiary hearing on remand, or to the extent the court declines to admit or judicially notice such evidence, our holdings herein would dictate that the trial court must grant the petition for resentencing and resentence petitioner accordingly. (See § 1172.6, subd. (d)(3).)

34.

testimony. (§ 1172.6, subd. (d)(3).) That said, the court may not consider hearsay evidence admitted in a preliminary hearing pursuant to subdivision (b) of section 872 unless another hearsay exception applies. (§ 1172.6, subd. (d)(3).) The plain meaning of section 1172.6, subdivision (d)(3) is therefore clear. At the evidentiary hearing, the court may consider *any* evidence previously admitted, other than section 872, subdivision (b) evidence, so long as the evidence remains admissible under current law. (*People v. Ramos* (2025) 112 Cal.App.5th 174, 184.) This includes preliminary hearing evidence not admitted pursuant to section 872, subdivision (b). (*People v. Davenport* (2023) 95 Cal.App.5th 1150, 1158.)

Some evidence admitted at a preliminary hearing but excluded at trial may be inadmissible at the evidentiary hearing, either because it was admitted at the preliminary hearing pursuant to section 872, subdivision (b), or because it is no longer admissible under current law. (§ 1172.6, subd. (d)(3).) Here, however, the trial court apparently excluded petitioner's statements regarding the earlier stabbing from trial pursuant to Evidence Code section 352 after determining the statements would be unduly prejudicial before the jury. This balancing of probative value against the potential for prejudice has limited utility in an evidentiary hearing where the court acts as finder of fact. (See, e.g., *In re Jose M.* (1994) 21 Cal.App.4th 1470, 1481 [trial court is presumed capable of properly utilizing evidence admitted for limited purposes].) Instead, we generally presume the court is capable of weighing admissible evidence without being prejudiced by extraneous matters. (*People v. Walkkein* (1993) 14 Cal.App.4th 1401, 1408.) Accordingly, the trial court's decision to exclude this evidence from petitioner's trial does not necessarily suggest the evidence was inadmissible at the evidentiary hearing.

We therefore reject petitioner's contention that section 1172.6 categorically prohibited admission of this evidence at the evidentiary hearing. Nonetheless, because the court did not admit the preliminary hearing evidence at the evidentiary hearing, we need not determine whether it would have been an abuse of discretion for it to do so. On

remand, the court may consider the admissibility of the preliminary hearing evidence or any new evidence relating to petitioner's presence at the prior stabbing that the People wish to present.

## B.    Consideration of Petitioner's Youth

Petitioner contends the trial court erroneously failed to consider his age in determining whether he acted with reckless indifference to human life, and counsel was constitutionally ineffective in failing to raise this issue. Petitioner's age at the time of the offense may be an appropriate consideration in a new evidentiary hearing on remand. "Courts of Appeal have recognized that 'a defendant's youth is a relevant factor in determining whether the defendant acted with reckless indifference to human life.' " (*Emanuel*, *supra*, 17 Cal.5th at p. 885, fn. 6.) A defendant's youth may affect his or her awareness of the dangers posed by " 'the nature of the crime, weapons used, or past experience or conduct of other participants' " (*People v. Harris* (2021) 60 Cal.App.5th 939, 960), and his or her ability to "adequately appreciate the risk of death posed by his [or her] criminal activities" (*In re Moore* (2021) 68 Cal.App.5th 434, 454). Therefore, a defendant's youth at the time of the offense is properly considered as part of the totality of circumstances bearing on whether the defendant acted with reckless indifference to human life. (*Moore*, at pp. 454–455.)

## C.    Consideration of Forensic Psychologist's Testimony

Petitioner also contends the court erred in failing to consider favorable testimony presented by the defense's forensic psychologist at trial. However, the record does not reflect whether the court failed to consider this evidence or merely found it unpersuasive. In any event, petitioner may argue any relevant inferences to be drawn from this evidence on remand.

**DISPOSITION**

The order denying the petition is reversed and the matter is remanded for further proceedings consistent with this opinion.

DETJEN, J.

WE CONCUR:

HILL, P. J.

PEÑA, J.